## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| HELLS ANGELS MOTORCYCLE CORPORATION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 12-CV-1357 (GK) |
| JANET NAPOLITANO, HILLARY RODHAM CLINTON, and ALEJANDRO MAYORKAS, | ) ) ) | |
| Defendants. | ) ) | |

## DEFENDANTS' MOTION TO DISMISS

Defendants move to dismiss the Complaint filed by Plaintiff Hells Angels Motorcycle Corporation ("HAMC") under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) for a lack of subject matter jurisdiction and failure to state a claim. In 2011, the Departments of State and Homeland Security added the motorcycle gang Hells Angels to a list of known criminal organizations, which also includes organizations like the Mafia, the Chinese Triads, the Yakuza, organized Salvadoran street gangs, and other biker gangs. As a result, active foreign members of Hells Angels are presumptively ineligible for a visa to enter the United States under 8 U.S.C. § 1182(a)(3)(A)(ii). HAMC disputes its designation as an organized criminal group, and seeks judicial review over possible future decisions by Department of State consular officers to deny visas to Hells Angels members.

HAMC cannot establish subject matter jurisdiction for three independent reasons: standing, ripeness, and the doctrine of consular nonreviewability. First, HAMC lacks standing on behalf of individual Hells Angels members because its allegations do not adequately explain the connection between HAMC and individual Hells Angels members, and the allegations do not show that the alleged future harm (denial of Plaintiff's alleged constitutional rights by excluding

alien Hells Angels members from the United states) is definite or imminent enough to create a case or controversy.  HAMC likewise lacks standing to sue on its own behalf because it does not allege any concrete and imminent harm to the Hells Angels corporation.  Second, HAMC's claims are not ripe because they are contingent on possible future agency action – the denial of a visa.  Moreover, the Government's interpretation of 8 U.S.C. § 1182(a)(3)(A)(ii) to presumptively apply to active Hells Angels members is non-binding internal guidance (not final administrative action), and thus not subject to judicial review in this or any other lawsuit.  Third, even if HAMC were attempting to challenge the actual decision to deny a Hells Angels member's visa application, the doctrine of consular nonreviewability would preclude this lawsuit.  Such a denial would be based on 8 U.S.C. § 1182(a)(3)(A)(ii), which is a facially legitimate reason to deny a visa to an active member of a group that engages in organized crime, like the Hells Angels.  The doctrine of consular nonreviewability precludes this Court from looking behind the decision to deny a visa under § 1182(a)(3)(A)(ii).  That doctrine ensures that the judiciary does not second guess a decision to exclude an alien, which inherently involves the Executive Branch's assessment of national security and law enforcement concerns.

Furthermore, even if HAMC were able to establish jurisdiction, this Court should dismiss the Complaint for failure to state a claim upon which relief can be granted.  The State Department's interpretation of § 1182(a)(3)(A)(ii) is fully consistent with the statute.  Also, HAMC fails to identify any statutory or constitutional right or interest enjoyed by HAMC that has been, or will be, violated by any exclusion of alien Hells Angels members in accordance with the existing law and procedures that are the subject of this Complaint.  For all these reasons, this Court should dismiss the Complaint with prejudice for a lack of subject matter jurisdiction and failure to state a claim upon which relief can be granted.

Dated:  November 26, 2012                Respectfully submitted,

STUART F. DELERY                         s/ Craig A. Defoe
Principal Deputy Assistant Attorney General   CRAIG A. DEFOE
                                         Trial Attorney
JEFFREY S. ROBINS                        United States Department of Justice
Assistant Director                       Office of Immigration Litigation
                                         District Court Section
                                         P.O. Box 868, Ben Franklin Station
                                         Washington, D.C. 20044
                                         Telephone: (202) 532-4114
                                         Facsimile: (202) 305-7000
                                         E-mail: Craig.Defoe@usdoj.gov

                                         Attorneys for Defendants

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| HELLS ANGELS MOTORCYCLE CORPORATION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 12-CV-1357 (GK) |
| JANET NAPOLITANO, HILLARY RODHAM CLINTON, and ALEJANDRO MAYORKAS, | ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS**

As the law and guidance currently stand, active members of the Hells Angels are presumptively ineligible for a visa under 8 U.S.C. § 1182(a)(3)(A)(ii) because the Department of State, in conjunction with the Department of Homeland Security ("DHS"), determined that the Hells Angels biker gang is an organized crime group. *See* 9 Foreign Affairs Manual ("FAM") 40.31 N5.3. Through this lawsuit, the Hells Angels Motorcycle Corporation ("HAMC") asks this Court to second-guess this administrative guidance, thus making it easier for foreign Hells Angels gang members to enter the United States. HAMC challenges the Department of State's interpretation of § 1182(a)(3)(A)(ii) and its application to active members of the Hells Angels, and challenges the constitutionality of future visa denials based on that statute.

Several jurisdictional doctrines preclude this lawsuit. HAMC lacks standing because, as a "collection of many individual charters," it does not show that it has standing as an organization to sue on behalf of individual members of those Hells Angels charters. ECF No. 1 ¶ 1. Also, HAMC's pleading fails to establish the injury-in-fact requirement necessary to sue either on its own behalf or on behalf of Hells Angels members. HAMC's claims are unripe both

because they are dependent on future administrative decisions (the denial of visas), and because they relate to internal agency guidance to its employees that does not conclusively affect the rights of any Hells Angels member, and thus is not subject to judicial review.  Moreover, because HAMC explicitly asks this Court to intervene in future visa eligibility determinations by consular officers, the doctrine of consular nonreviewabilty precludes this lawsuit.  Finally, even if HAMC had standing and some limited form of review were available, its statutory and constitutional claims fail as a matter of law and should be dismissed on that basis.

Therefore, this Court should dismiss the Complaint with prejudice under either Federal Rule of Civil Procedure 12(b)(1) or Rule 12(b)(6).

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A.      Summary of the Complaint

On August 16, 2012, HAMC filed this lawsuit challenging guidance developed by the Department of State and DHS for use by agency officials in applying 8 U.S.C. § 1182(a)(3)(A)(ii), which renders inadmissible any alien who the official reasonably believes seeks entry into the United States to engage, at least incidentally, in "unlawful activity." Specifically, HAMC challenges the provision in the FAM that directs officials presume that active members of known criminal organizations are ineligible for a visa, and to seek a legal opinion from the Visa Office of the Department of State when any active member of a known criminal organization, including "biker gangs the Hells Angels" and others, applies for a visa.  9 FAM 40.31 N5.3.

The only plaintiff in this lawsuit is the HAMC itself.  ECF No. 1 ¶ 1.  Defendants are Janet Napolitano, Secretary of Homeland Security; Hillary Rodham Clinton, Secretary of State; and Alejandro Mayorkas, Director of United States Citizenship and Immigration Services, all

sued in their official capacities (collectively "the Government").  *Id.* ¶¶ 2-4.  HAMC asserts

jurisdiction under 28 U.S.C. § 1331 and the Administrative Procedure Act ("APA"), 5 U.S.C.

§§ 701-706.  ECF No. 1 ¶ 5.

      HAMC alleges that it is a "world-wide association of charters with members residing in

and outside of the United States."  ECF No. 1 ¶ 15.  HAMC holds a semi-annual event known as

the World Run to which international members are invited for the purpose of socializing and

"usually" riding motorcycles.  *Id.* ¶ 17.  In 2011, the World Run was held in New Hampshire.

*Id.* ¶ 18.  "Foreign members applied for visas to attend the event and were denied because of

their membership in Hells Angels charters."  *Id.*  HAMC alleges that there will be "similar events

in the United States in the future," for which "[f]oreign members of Hells Angels charters will

apply for visas to attend."  *Id.* ¶ 19.  HAMC alleges that the Government "will deny visas to all

aliens based solely on their membership in a Hells Angels charter . . . ."  *Id.* ¶ 22.  HAMC adds

that it is "not a criminal organization," and "[m]any" HAMC members "have no criminal record

whatsoever."[1]  *Id.* ¶¶ 20-21.

      HAMC alleges the following different, yet closely related legal claims:  (1) the FAM

provision "designating Plaintiff as a known criminal organization is unwarranted by the facts and

not in accordance with law"; (2) the FAM provision is *ultra vires* because "Congress did not

intend . . . 8 U.S.C. § 1182(a)(3)(A), to result in a blanket denial of visas to all members of

Plaintiff's group solely based on their membership in that group"; (3) the FAM provision and

§ 1182(a)(3)(A) violate the First Amendment; (4) the FAM provision and § 1182(a)(3)(A)

---

[1] All references to individual Hells Angels members in this motion should be understood to mean individual members of the separate Hells Angels charter groups that HAMC purports to represent in this case.

violate the Fifth Amendment; and (5) § 1182(a)(3)(A) is vague and overly broad.  ECF No. 1 ¶¶ 33-38.

HAMC requests the following relief:  (1) "judgment declaring that [HAMC] is not a known criminal organization" for purposes of § 1182(a)(3)(A); (2) judgment ordering the Government to rescind 9 FAM 40.31 N5.3 because it violates § 1182(a)(3)(A) and the APA; (3) alternatively, judgment declaring that 9 FAM 40.31 N5.3 and § 1182(a)(3)(A) violate the Constitution; and (4) injunctive relief prohibiting the Government from "enforcing the challenged provision against HAMC and its foreign members."  ECF No. 1 ¶¶ 39-42.

**B.      The History and Application of 8 U.S.C. § 1182(a)(3)(A)(ii) to Active Members of Organized Crime Groups including the Hells Angels.**

The Immigration and Nationality Act ("INA") defines categories of aliens ineligible for visas or admission into the United States.  *See* 8 U.S.C. § 1182.  An earlier version of 8 U.S.C. § 1182 directed the Government to exclude from the United States any alien "who the consular officer or the Attorney General knows or has reason to believe seek[s] to enter the United States solely, principally, or incidentally to engage in activities which would be prejudicial to the public interest, or endanger the welfare, safety or security of the United States."  8 U.S.C. § 1182(a)(27) (1964).

In 1965, the Attorney General and Secretary of State agreed that "an alien's membership in the Mafia was sufficient basis to find the alien *ineligible* under then [8 U.S.C. § 1182(a)(27)]." 9 FAM 40.31 N5.3(b).  Ever since then, the Government has considered membership in a group designated for INA purposes as a criminal organization to be a presumptive basis for finding an alien ineligible for admission to the United States.  *Id.*  The statutory basis for this determination shifted from 8 U.S.C. § 1182(a)(27) (1964) to 8 U.S.C. § 1182(a)(3)(A)(ii), when Congress enacted the latter section as part of the Immigration Act of 1990, Pub. L. No. 101-649, Title VI,

4

§§ 601(a) and (e), 104 Stat. 4978, 5067, 5069, 5077 (1990).  *See* USE OF INA § 212(A)(3)(A)(II) TO EXCLUDE MEMBERS OF ORGANIZED CRIME GROUPS IN RUSSIA AND OTHER FORMER SOVIET STATES, INS Gen. Counsel Op. 95-20, 1995 WL 1796327 (Sept. 14, 1995).

The language of § 1182(a)(3)(A)(ii) differs slightly from the language of former § 1182(a)(27).  An alien is subject to exclusion under current § 1182(a)(3)(A)(ii) if "a consular officer or the Attorney General knows, or has reason to believe, [that the alien] seeks to enter the United States to engage solely, principally, or incidentally in . . . any other unlawful activity."  8 U.S.C. § 1182(a)(3)(A)(ii).  This section "is not restricted to crimes or 'criminal' activities, but applies as well to 'unlawful' activities" such as civil offenses.  INS Gen. Counsel Op. 95-20.  Criminal history is not a necessary prerequisite for application of the section.  *Id.*  Thus, the Government determined that the language of § 1182(a)(3)(A)(ii) presumptively covered active members of organized criminal groups, just as the prior § 1182(a)(27) had done so.  *See id.*; 9 FAM 40.31 N5.3(b).

In 1992, the Department of State and Attorney General agreed to add the Chinese Triads to the list of organized criminal groups covered by § 1182(a)(3)(A)(ii).  *See* 9 FAM 40.31 N5.3(b).  In 1995, the Government added to the list the organized crime families of the former Soviet Union.  *Id.*  In 2005, the Department of State and Department of Homeland Security ("DHS") added to the list the "organized Savadoran street gangs in North America, including, but not limited to, the Mara Salvatrucha 13 (MS 13) and 18th Street . . . gangs."  *Id.*  Finally, in 2011, the Department of State and DHS added to the list "the Yakuza and the organized biker gangs Hells Angels, Outlaws, Bandidos, and Mongols."  *Id.*

National security and law enforcement concerns led the State Department and DHS to add the Hells Angels to the list of organized crime groups found in 9 FAM 40.31 N5.3.  A

significant administrative record, including some publicly available derogatory information, supported that decision.  For one example, the 2009 National Gang Threat Assessment by the National Gang Intelligence Center explained that Hells Angels is a gang with 2,000 to 2,500 members in over 250 chapters found in the United States and 26 foreign countries.  *See* National Gang Threat Assessment at 30, National Gang Intelligence Center (2009).[2]  The threat assessment stated that the Hells Angels gang "poses a criminal threat on six continents."  *Id.*  The threat assessment explained that Hells Angels is involved in the production, transportation, and distribution of numerous illicit drugs, and was "involved in other criminal activity, including assault, extortion, homicide, money laundering, and motorcycle theft."  *Id.*  Another government report[3], more recently added to the administrative record, identifies the Hells Angels as an organization involved in the cultivation, production, and distribution of illegal drugs in Canada and across the northern border of the United States.  National Northern Border Counternarcotics Strategy at 4, 7-8, 63, Office of National Drug Control Policy (Jan. 2012).[4]

The rationale for presuming that members of organized criminal groups are inadmissible is the reasonable belief that "these groups operate[] as permanent organized criminal societies."  9 FAM 40.31 N5.3(c).  The Department of State explained as follows:

> Active membership in these groups could reasonably be considered to involve a permanent association with criminal activities and, therefore, could reasonably support a conclusion that any travel by such an alien to the United States could

---

[2] This source is publicly available at http://www.fbi.gov/stats-services/publications/national-gang-threat-assessment-2009-pdf (last visited Nov. 7, 2012).

[3] This source is publicly available at http://www.whitehouse.gov/sites/default/files/page/files/national_northern_border_counternarcotics_strategy_.pdf (last visited Nov. 23, 2012).

[4] The Government provides this publicly-available background information on the Hells Angels to give context to the decision to designate the Hells Angels as an organized crime group.  The Government nonetheless maintains that this factual determination is exempt from judicial review.  *See infra* Argument § B.2.

result in a violation of U.S. law, whether as a principal or incidental result of such travel.[5] Therefore, while the ineligibility as a matter of law related to the specific nature of the trip, the basis for making the finding gave a reasonable basis for treating this as a blanket ineligibility which would apply to every application for entry to the United States.

*Id.* However, active membership in an organized criminal group merely creates a *presumption* of ineligibility for a visa. 9 FAM 40.31 N5.3(a). Each visa application from an active member of an organized crime group is considered on its own merits; and in each such case, the consular officer handling the application must seek an "advisory opinion" from the Visa Office's Advisory Opinions Division. *Id.* An alien may overcome the presumption of inadmissibility if he can demonstrate to the satisfaction of the consular officer that, based on the specific circumstances of his planned visit, he is "not going to engage, even incidentally, in violations of United States law." 9 FAM 40.31 N.5.3(d); *see also* 8 U.S.C. § 1361 (burden of proof is on the alien to show eligibility for a visa). For example, an alien may be able to overcome the presumption of inadmissibility if he seeks entry to address a "serious medical emergency" or if the alien is "coming to cooperate in a U.S. Government investigation into criminal activity." 9 FAM 40.31 N.5.3(d). In those exceptional situations, a consular officer may issue a visa to an active member of an organized crime group with the concurrence of the Department of State's Office of Visa Services, Advisory Opinions Division.

---

[5] The Government notes that *active membership* in an *organized crime group* is what presumptively triggers the 8 U.S.C. § 1182(a)(3)(A)(ii) inadmissibility bar. The designation of the Hells Angels and certain other motorcycle gangs has no impact on most members of motorcycle clubs around the world, who may well be law-abiding members of society and remain unaffected by 9 FAM 40.31 N.5.3. *See* Europol Review 2011 at 63, available at https://www.europol.europa.eu/sites/default/files/publications/europolreview2011.pdf (last visited Nov. 7, 2012) (differentiating between members of motorcycle clubs who are part of normal society and members of outlaw motorcycle gangs).

Thus, for the last 47 years, the Executive branch has interpreted and applied the INA to presumptively preclude members of designated organized crime groups from entering the United States. This interpretation has been published for nearly this entire period.

## II.  LEGAL BACKGROUND

### A.    Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

The first and most fundamental question in every case is whether the court has subject-matter jurisdiction. *Bender v. Williamsport Area School Dist.*, 475 U.S. 534, 547 (1986). The party asserting jurisdiction bears the burden of establishing that a cause of action lies within the federal court's limited jurisdiction. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). A district court must dismiss any claim over which it lacks subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1).

A district court should grant a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) where the plaintiff has failed to state a claim on which the Court can grant the requested relief. Fed. R. Civ. P. 12(b)(6). Although the Court must accept factual allegations in a complaint as true, dismissal under Rule 12(b)(6) is appropriate if those factual allegations show that the plaintiff is not entitled to relief as a matter of law. *Neitzke v. Williams*, 490 U.S. 319, 326-27 (1989).

### B.    Standing.

"[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977). This test is meant to "weed out plaintiffs

who try to bring cases, which could not otherwise be brought, by manufacturing allegations of standing that lack any real foundation." *New York State Club Ass'n v. City of New York*, 487 U.S. 1, 9 (1988). The association must allege that "its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit." *Warth v. Seldin*, 422 U.S. 490, 511 (1975).

Article III of the Constitution "gives the federal courts jurisdiction over only 'cases and controversies,' and the doctrine of standing serves to identify those disputes which are appropriately resolved through the judicial process." *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990). In order to establish standing, the plaintiff must show: (1) an "'injury in fact' – an invasion of a legally protected interest"; (2) "a causal connection between the injury and the conduct complained of;" and (3) that it is "likely," rather than merely "speculative," that a favorable decision will redress the injury. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). A plaintiff must establish standing for "each claim he seeks to press," and for "each form of relief sought." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006). The factual allegations regarding standing must be "clear[] and specific[]." *Whitmore*, 495 U.S. at 155. "A federal court is powerless to create its own jurisdiction by embellishing otherwise deficient allegations of standing." *Id.* at 155-56.

When a plaintiff seeks only injunctive and declaratory relief – as in the instant case – the plaintiff satisfies the "injury in fact" requirement only if the allegations are sufficient to show "a real and immediate threat" of future harm. *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983). The injury must be "concrete in both a qualitative and temporal sense," which means that the injury must be both: (1) "distinct and palpable, as opposed to merely abstract"; and

(2) "actual or imminent, not conjectural or hypothetical." *Whitmore*, 495 U.S. at 155 (internal quotations omitted).

For a future injury to satisfy the temporal imminence requirement, it must be "certainly impending" – "[a]llegations of *possible* future injury do not satisfy the requirements of Art. III." *Whitmore*, 495 U.S. at 158 (emphasis added). Notably, "past wrongs do not in themselves amount to that real and immediate threat of injury necessary to make out a case or controversy." *Lyons*, 461 U.S. at 103. If the alleged future injury depends on actions that the plaintiff intends to "some day" take in the future, the plaintiff must provide information about *when* he will take that action in order to meet the imminence requirement. *See Worth v. Jackson*, 451 F.3d 854, 858 (D.C. Cir. 2006). "When considering any chain of allegations for standing purposes, [a court] may reject as overly speculative those links which are predictions of future events (especially future actions to be taken by third parties) . . . ." *United Transp. Union v. I.C.C.*, 891 F.2d 908, 912 (D.C. Cir. 1989); *see also Lujan*, 504 U.S. at 562 (when a plaintiff's standing depends on the "government's allegedly unlawful regulation . . . of *someone else*," standing is "'substantially more difficult' to establish" (citation omitted)).

C.    **Ripeness**

"The ripeness doctrine is 'drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction.'" *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003). To determine whether an action is ripe, the court must "evaluate (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Id.* "[A] dispute is not ripe if it is not fit, and (at least in an APA case) it is not fit if it does not involve final agency action." *Holistic Candlers &*

*Consumers Ass'n v. Food & Drug Admin.*, 664 F.3d 940, 943 n.4 (D.C. Cir. 2012). If no

statutory provision broadens judicial review, then:

> [A] regulation is not ordinarily considered the type of agency action "ripe" for judicial review under the APA until the scope of the controversy has been reduced to more manageable proportions, and its factual components fleshed out, by some concrete action applying the regulation to the claimant's situation in a fashion that harms or threatens to harm him.

*Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990).

### D.    The Doctrine of Consular Nonreviewability

The Supreme Court has repeatedly recognized the principle that "the power to exclude

aliens is inherent in sovereignty, necessary for maintaining normal international relations and

defending the country against foreign encroachments and dangers – a power to be exercised

exclusively by the political branches of government." *Kleindienst v. Mandel*, 408 U.S. 753, 765

(1972); *see also U.S. ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 543 (1950) ("[I]t is not within

the province of any court, unless expressly authorized by law, to review the determination of the

political branch of the Government to exclude a given alien."). This principle gives rise to "what

has become known as the doctrine of consular nonreviewability." *Saavedra Bruno v. Albright*,

197 F.3d 1153, 1159 (D.C. Cir. 1999). "The doctrine holds that a consular official's decision to

issue or withhold a visa is not subject to judicial review, at least unless Congress says

otherwise." *Id.* The doctrine of consular nonreviewability precludes all claims challenging

consular officer visa decisions, including claims brought under the APA or the general federal

question statute, 28 U.S.C. § 1331.[6] *Saavedra Bruno*, 197 F.3d at 1160-62.

---

[6] Notably, in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Congress amended the Immigration and Nationality Act, 8 U.S.C. § 1329, to "mak[e] clear that district court jurisdiction founded on the immigration statute is confined to actions *brought by the government*." *Saavedra Bruno*, 197 F.3d at 1162 (emphasis added). This change to § 1329 "reinforce[ed] the judgment . . . that the immigration laws preclude judicial

In narrow circumstances, courts have allowed for extremely limited review of the Government's decision to deny an alien a visa.  If the denial of a visa to an alien implicates the constitutional rights of United States citizens, then a court may consider whether the "reason [given] was facially legitimate and bona fide." *Mandel*, 408 U.S. at 769.[7]  If the Government submits a "facially legitimate and bona fide reason" for denying entry to an alien, "the courts will neither look behind the exercise of that discretion, nor test it by balancing its justification against the [constitutional] interests" of the United States citizens in favor of the alien's entry. *Id.* at 770.

## III.  ARGUMENT

**A.    HAMC fails to establish that it has standing to maintain this lawsuit.**

### 1.    HAMC's allegations are too vague to establish that it has standing to sue on behalf of individual members of Hells Angels.

The allegations in the Complaint do not establish that HAMC has standing to sue on behalf of individual members of Hells Angels.  HAMC is a corporation registered in California. ECF No. 1 at 1.  HAMC asserts that its members are "many individual charters all over the world."  ECF No. 1 ¶ 1.  "Each charter is distinct and chooses its own members.  There is no national or international club president."  *Id.*  HAMC does not explain the relationship between the separate and distinct Hells Angels *charters* and the HAMC corporate entity.  Nor does HAMC explain the relationship between *individual members* of Hells Angels in these "distinct"

---

review of consular visa decisions and that the doctrine of consular nonreviewability remains intact, until Congress provides otherwise."  *Id.* at 1162-63.

[7] In *Mandel* the plaintiffs sought review over the Attorney General's denial of a waiver of inadmissibility, rather than the consular officer's denial of the visa.  *Mandel*, 408 U.S. at 760. Still, courts have generally determined that the narrow "facially legitimate and bona fide" exception to the doctrine of consular nonreviewability may also apply to consular officer decisions.  *See, e.g., Abourezk v. Reagan*, 785 F.2d 1043, 1050 (D.C. Cir. 1986).

charters and the HAMC corporate entity. *See id.* Finally, HAMC does not explain its organizational purpose, or how its purpose might overlap with the legal claims it asserts in this lawsuit.

Thus, to the extent that HAMC seeks to sue on behalf of individual Hells Angels members, it lacks standing because its allegations do not show that individual members have "indicia of membership" in the HAMC *corporation*. *See Hunt*, 432 U.S. at 344-45 (if an organization does not have "members" in the traditional sense, it may sue on behalf of its "constituents" only if they "possess all of the indicia of membership in [the] organization"). Without more detailed factual allegations, it is impossible to tell whether Hells Angels members possess the required "indicia of membership" in the Hells Angels corporate entity.

Furthermore, HAMC's failure to identify its corporate purpose precludes it from representing Hells Angels members because it is impossible to tell on the face of the Complaint whether the interests it seeks to advance in this lawsuit are "germane to the organization's purpose," as required. *Hunt*, 432 U.S. at 343. It is unclear how the interests of HAMC might be served by admitting foreign Hells Angels members into the United States. Thus, HAMC has failed to establish standing to sue on behalf of individual Hells Angels members.

    **2.**     **HAMC cannot sue on behalf of individual Hells Angels members because it does not show that harm to those individuals is imminent.**

In addition to the defects identified above, HAMC also lacks standing to sue on behalf of individual Hells Angels members because it does not demonstrate that harm to those members is imminent. HAMC must show that Hells Angels members would "otherwise have standing to sue in their own right," which includes the requirement that harm be imminent. *See Hunt*, 432 U.S. at 343; *Lyons*, 461 U.S. at 105.

HAMC's allegations do not show that any alleged injury to a Hells Angels member is imminent.  HAMC alleges merely that foreign Hells Angels members "will apply for visas to attend [the World Run] and other similar events in the United States in the future," and will be denied admission based on 8 U.S.C. § 1182(a)(3)(A)(ii), and 9 FAM 40.31 N5.3.  ECF No. 1 ¶¶ 19, 22.  HAMC does not allege that any World Run or similar event is scheduled in the United States; nor does HAMC provide any information to allow the Court to estimate *when* another such event would occur.  At best, it is *possible* that the amorphous injury that HAMC alleges might occur some day in the future.  But possible future injury does not satisfy Article III's requirement that injury be "certainly impending," especially when that injury depends on the actions of third parties, as here.  *See Whitmore*, 495 U.S. at 158; *Worth*, 451 F.3d at 858; *United Transp. Union*, 891 F.2d at 912.

### 3. HAMC cannot sue on its own behalf because it does not show that harm to itself is concrete and imminent.

To the extent that HAMC is suing on its own behalf, it likewise cannot establish standing because it does not meet the injury-in-fact requirement.  First, there can be no distinct or palpable injury from the decision to designate the Hells Angels gang as a criminal organization, which has no direct effect on HAMC.  *See Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40 (1976) ("[A]n organization's abstract concern with a subject that could be affected by an adjudication does not substitute for the concrete injury required by Art. III.").  Second, the only distinct harm that HAMC arguably might suffer is harm arising from the potential future denial of a visa to, or exclusion of a foreign Hells Angels member from the United States.  *See* ECF No. 1 ¶¶ 29-30 (alleging that exclusion of foreign Hells Angels members "infringes on Plaintiff's" First Amendment rights).  But as discussed above, the allegations do not show that any such harm is imminent, or "certainly impending."  *See Whitmore*, 495 U.S. at 158.  Therefore, HAMC lacks

14

standing to sue either on its own behalf or on behalf of individual Hells Angels members, and this Court should dismiss the entire Complaint for a lack of standing.

**B.     HAMC's claims are not ripe or otherwise justiciable because the FAM provision it challenges is non-final and non-binding.**

There are two different agency actions implicated by the relief sought in this case:  (1) the potential future decision of a consular officer to refuse a visa to a foreign Hells Angels member; and (2) the addition, in 2011, of the Hells Angels to the list of organized crime groups found in 9 FAM 40.31 N5.3 whose members are presumptively inadmissible under 8 U.S.C. § 1182(a)(3)(A)(ii).  Neither of these actions is "final," and thus, neither is ripe for judicial review.  Also, specifically regarding the latter action (adding Hells Angels to 9 FAM 40.31 N5.3), the challenged FAM provision is merely non-binding internal State Department guidance that advises consular officers adjudicating visas at overseas posts to seek the views of the Visa Office in the category of cases covered by the FAM.  As such, the FAM provision is *exempt* from judicial review.

**1.     HAMC's claims implicating possible future decision of consular officers to deny visas are not ripe because they relate to non-final and non-imminent agency action.**

First, HAMC does not identify any specific visa denial that it wishes to challenge, nor could it seek review of a consular officer's decision to deny a visa to a Hells Angels member because visa decision are protected by the doctrine of consular nonreviewability (discussed more thoroughly below) and visa adjudications at consulates abroad are not subject to review under the APA.  *Saavedra Bruno*, 197 F.3d at 1160-62.  Furthermore, HAMC does not challenge any final agency action or show that injury is imminent.  Even if HAMC were somehow seeking to challenge a particular future visa decision, its claim would be purely speculative, and thus not ripe.  *See* ECF No. 1 ¶ 5.  Although HAMC suggests that this action *might* occur in the future,

such future agency action does not meet the requirement that agency action be *final* for it to be ripe under the APA.  *See Holistic Candlers*, 664 F.3d at 943 n.4; 5 U.S.C. § 704 (providing a cause of action for "[a]gency action made reviewable by statute and *final agency action* for which there is no other adequate remedy in a court" (emphasis added)).  A visa denial claim would fail on ripeness grounds because HAMC does not demonstrate that any future decision to deny a visa to an active Hells Angels member is imminent.  *See supra* Argument § A.2.

> **2.    HAMC's claims arising out of the State Department's designation of the Hell Angels as an organized crime group are not ripe or otherwise justiciable because that agency action is not final or binding.**

To the extent that HAMC seeks to challenge the FAM provision itself, those claims are not ripe because the FAM provision is merely internal guidance from the State Department to its employees, providing an interpretation of a statutory provision relevant to their work.  By itself, the guidance does not mandate any conclusion in affected cases.  Agency action is not final if it "does not itself adversely affect [the] complainant but only affects his rights adversely on the contingency of future administrative action."  *DRG Funding Corp. v. Sec'y of Hous. & Urban Dev.*, 76 F.3d 1212, 1214 (D.C. Cir. 1996) (quoting *Rochester Tel. Corp. v. United States*, 307 U.S. 125, 130 (1939)).  Here, the possibility that the FAM provision will affect HAMC or a Hells Angels member is purely contingent on future agency action – specifically, if a consular officer denies the visa application of an active member of the Hells Angels.  Without that future administrative action, the FAM provision has no effect on HAMC.  Thus, any claim related to the FAM provision is not ripe for judicial review.

Furthermore, the FAM provision, as non-binding internal agency guidance, is not subject to judicial review.  Courts cannot review claims that arise from an agency's non-binding interpretations.  *See Western Radio Services Co. v. Espy*, 79 F.3d 896, 900 (9th Cir. 1996) ("we

will not review allegations of noncompliance with an agency statement that is not binding on the agency"). An agency interpretation is non-binding unless it meets both substantive and procedural requirements. Substantively, an agency interpretation is non-binding, and thus not subject to judicial review, unless it determines "rights or obligations" or result in "legal consequences." *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 807-08 (D.C. Cir. 2006). The D.C. Circuit has explained the substantive requirement as follows:

> Non-binding action . . . merely expresses an agency's interpretation, policy, or internal practice or procedure. Such actions or statements are not determinative of issues or rights addressed. They express the agency's intended course of action, its tentative view of the meaning of a particular statutory term, or internal house-keeping measures organizing agency activities. They do not, however, foreclose alternative courses of action or conclusively affect rights of private parties.

*Batterton v. Marshall*, 648 F.2d 694, 702 (D.C. Cir. 1980).

An agency interpretation likewise is non-binding if it was not formally promulgated pursuant to APA rulemaking. *Chrysler Corp. v. Brown*, 441 U.S. 281, 303 (1979). If an agency manual is not "published in either the Federal Register or the Code of Federal Regulations," and not "promulgated in accordance with the procedural requirements imposed by Congress for the creation of binding regulations," then it is "not intended to be binding." *Moore v. Apfel*, 216 F.3d 864, 869 (9th Cir. 2000). HAMC concedes that the FAM fits this description. ECF No. 1 ¶ 14 ("[T]he FAM rules are not subject to the [APA's] rule making procedures.").

The FAM provision at issue in this case is non-binding because it does not conclusively affect the rights of HAMC or its foreign members. The FAM is an internal manual intended for use by Department of State consular officers. The FAM provision at issue instructs consular officers to refer the relevant visa cases to the Visa Office for an Advisory Opinion, and indicates that membership in the Hells Angels gang will weigh against an applicant. 9 FAM 40.31

N5.3(a).  As a result, the consular officer *likely* will deny a visa application from an active member of Hells Angels under 8 U.S.C. § 1182(a)(3)(A)(ii).  *Id.*  However, exceptions to this rule are possible, even if they are rare.  9 FAM 40.31 N.5.3(e).  If the specific circumstances of the alien's visit give the consular officer reason to believe the section should not apply, such as in the case of a medical emergency or where the alien is cooperating with a criminal investigation, then a visa may be issued following receipt of an advisory opinion from the Visa Office.  9 FAM 40.31 N.5.3(d).  Thus, the language of the FAM provision shows that it does not "foreclose alternative courses of action or conclusively affect rights of private parties."  *See Batterton*, 648 F.2d at 702.  Accordingly, the FAM provision *itself* is not subject to judicial review because it is internal non-dispositive guidance.  *See Ctr. for Auto Safety*, 452 F.3d at 807-08.

This Court therefore should dismiss this case because its claims are not ripe or otherwise justiciable.  But even aside from the standing and ripeness defects discussed above, HAMC still could not challenge any *future* denial of a visa to an *actual* Hells Angels member under 8 U.S.C. § 1182(a)(3)(A)(ii) because the doctrine of consular nonreviewability would preclude such a claim, as discussed below.

**C.    Even if HAMC were challenging an actual decision to deny a Hells Angels member a visa, its claims would be barred by the doctrine of consular nonreviewability.**

**1.    The doctrine of consular nonreviewability would bar review of any challenge to a particular visa denial.**

Even assuming, *arguendo*, that HAMC could establish standing and its claims were ripe, any effort to challenge individual visa adjudications would be barred by the doctrine of consular nonreviewability.  If an alien member of the Hells Angels applies for a visa abroad and a consular officer denies the visa application under 8 U.S.C. § 1182(a)(3)(A)(ii), the doctrine of

consular nonreviewability shields the consular officer's action from judicial review. *See Saavedra Bruno*, 197 F.3d at 1159. The doctrine of consular nonreviewability applies notwithstanding the APA or the general federal question jurisdiction statute. *Id.* at 1160-62.

HAMC's claims cannot fall within the narrow level of review recognized in the context of consular nonreviewability because no constitutional interests are at stake in this case. *See Mandel*, 408 U.S. at 769. First, HAMC does not show that the decision to deny a visa to a Hells Angels member would implicate the constitutional rights of a United States citizen, as required under case law. *See Mandel*, 408 U.S. at 769. While HAMC cites the First and Fifth Amendments in its Complaint, United States citizens have no liberty interest or due process right related to a future visa denial merely because they might like to "socialize" and go on "motorcycle ride[s]" together in the United States with random unidentified foreign Hells Angels members who might seek a visa. *See* ECF No. 1 ¶¶ 17, 31, 36; *Mostofi v. Napolitano*, 841 F. Supp. 2d 208, 212 (D.D.C. 2012) (holding that a United States citizen has no due process right to the admission of an alien spouse); *see also Swartz v. Rogers*, 254 F.2d 338, 339 (D.C. Cir. 1958) (holding that a United States citizen "has no constitutional right which is violated by the deportation of her husband").

Likewise, even if HAMC were properly suing on behalf of United States citizen Hells Angels members, the case law is clear that denying admission to foreign members affects no recognized First Amendment rights of HAMC or its United States citizen members. Socializing and going on motorcycle rides are not the type of conduct protected by the First Amendment. *See* ECF No. 1 ¶¶ 17, 35; *City of Dallas v. Stanglin*, 490 U.S. 19, 24-25 (1989) (holding that the First Amendment does not protect activity such as "coming together to engage in recreational dancing"). Even if they were, United States citizen Hells Angels members are free to socialize

19

with their foreign counterparts outside of the United States.  Any hindrance to HAMC's First

Amendment rights that results from the denial of a visa to a foreign Hells Angels members "is

but an indirect consequence of the Government's pursuit of an important task" – application of 8

U.S.C. § 1182(a)(3)(A)(ii).  *See Ukrainian-Am. Bar Ass'n v. Baker*, 893 F.2d 1374, 1381 (D.C.

Cir. 1990).  The fact that foreign Hells Angels members denied a visa may be "effectively

unavailable" to socialize with United States citizen Hells Angels members in the United States is

"not an infringement of plaintiffs' first amendment right of association."  *Id.* (holding that no

First Amendment violation occurs when the Government holds an unadmitted alien

incommunicado, despite a third-party's desire to provide legal assistance to the alien).  United

States citizen Hells Angels members are free to travel abroad to socialize.  The Government has

no duty to facilitate the socialization of Hells Angels members.  If a United States citizen has no

due process rights regarding the admission of an alien spouse (as *Swartz* and *Mostofi* establish),

then surely Hells Angels members have no First Amendment rights regarding the admission of

alien Hells Angels members they don't know, but with whom they may want to socialize.

Even if this Court assumes that HAMC's claims actually implicate the constitutional

rights of a United States citizen Hells Angels member, HAMC still cannot establish jurisdiction

because its own allegations show that the Government has a facially legitimate and bona fide

reason for denying visas to active foreign members of the Hells Angels.  In the hypothetical

scenario HAMC describes in its Complaint, a consular officer will, at some point in the future,

deny a visa to an active foreign member of Hells Angels under 8 U.S.C. § 1182(a)(3)(A)(ii).  The

facially legitimate reason for that denial would be 8 U.S.C. § 1182(a)(3)(A)(ii).[8]  Section

---

[8] Notably, active members of the Hells Angels are the only individuals who HAMC
purports to represent, and the only individuals affected by the inclusion of the Hells Angels in 9

1182(a)(3)(A)(ii) is plainly a *facially legitimate* reason to deny a visa to any alien – including an active Hells Angels member – who a consular officer has reason to believe seeks to enter the United States, at least incidentally, to engage in unlawful activity. *See Bustamante v. Mukasey*, 531 F.3d 1059, 1062 (9th Cir. 2008) (denial of visa on grounds that the consulate had reason to believe that alien was a drug trafficker was "plainly a facially legitimate reason, as it is a statutory basis for inadmissibility"). Denial of a visa under § 1182(a)(3)(A)(ii) is no less facially legitimate merely because the Department of State provides consular officers interpretive guidance in applying that section to members of designated organized crime groups.

Furthermore, under HAMC's hypothetical scenario, 8 U.S.C. § 1182(a)(3)(A)(ii) also would be a *bona fide* reason for denying a visa because HAMC does not allege or suggest that consular officers apply the statute in bad faith. Rather, a consular officer's decision to follow FAM guidance in applying § 1182(a)(3)(A)(ii) shows that the consular officer would be acting in *good faith* in denying a visa to an active member of Hells Angels. Given that HAMC only purports to represent Hells Angels charters (and presumably active Hells Angels members), any allegation of bad faith application of § 1182(a)(3)(A)(ii) in this scenario would be nonsensical. *See Bustamante*, 531 F.3d at 1062 (plaintiff must make sufficient allegation of bad faith to prove that a visa denial based on a facially legitimate reason is not bona fide).

It is worth emphasizing that a court's evaluation of facial legitimacy is narrowly constrained. This Court should not "look behind the exercise of . . . discretion" to apply § 1182(a)(3)(A)(ii) to Hells Angels members (especially in the context of visa applications not yet decided); nor can this Court balance the Government's interest in applying that

---

FAM 40.31 N5.3. Further, there is no suggestion that the FAM provision implicates every person possibly affiliated with the Hells Angels.

inadmissibility provision against the alleged constitutional interests at stake.  *See Mandel*, 408

U.S. at 770.  This Court could not evaluate the validity of the facts relied upon by a consular

officer in denying a visa to an active member of Hells Angels under § 1182(a)(3)(A)(ii) and 9

FAM 40.31 N5.3.[9]  *See Loza-Bedoya v. INS*, 410 F.2d 343, 346-47 (9th Cir. 1969) (holding that

the court was "without jurisdiction to order an American consular official to issue a visa" to an

alien even when a consular officer denies a visa based on *erroneous information*).  The prospect

that a Hells Angels member's visa application might be denied does not open the door for this

Court to engage in the improper factual inquiry about the nature of the Hells Angels organization

or the general application of § 1182(a)(3)(A)(ii) to active members of organized crime groups.

Consistent with the rationale underlying the doctrine of consular nonreviewability, a

decision denying a visa to an active Hells Angels member under § 1182(a)(3)(A)(ii) is especially

unfit for judicial review because it clearly involves matters of national security and law

enforcement.  *See Saavedra Bruno*, 197 F.3d at 1162 (noting that visa determinations inherently

are "matters touching on national security or foreign affairs").  National security concerns are

obvious in this case, where a group broadly associated with organized crime seeks to make it

easier for its active members to enter the United States.  Review of HAMC's claims could

improperly entangle this Court in the sensitive matters of national security and law enforcement

---

[9] Even if HAMC were challenging a specific situation where a consular officer denied a visa to a specific active member of Hells Angels, it could not use that claim as a back-door means to challenge the validity of 9 FAM 40.31 N5.3.  As discussed above, this internal agency guidance itself is not subject to judicial review because it is non-binding.  *See supra* Argument § B.2.  Such review likewise would offend the principles underlying the doctrine of consular nonreviewability.  *See Garcia v. Baker*, 765 F. Supp. 426, 428 (N.D. Ill 1990) (holding that the doctrine of consular nonreviewability precluded a claim "challenging the State Department's legal opinion . . . as contrary to the law").

that underlie the decision of the Department of State and DHS to include the Hells Angels on the list of organized criminal groups in 9 FAM 40.31(a).[10]

Finally, the doctrine of consular nonreviewability also would preclude review of any non-constitutional claims that HAMC might bring relating to hypothetical future decisions to deny visas to active members of Hells Angels. *See Saavedra Bruno*, 197 F.3d at 1164 ("With respect to purely statutory claims, courts have made no distinction between aliens seeking review of adverse consular decisions and the United States citizens sponsoring their admission; neither is entitled to judicial review."). This includes HAMC's non-constitutional claims, if applied to individual cases, that: (1) the FAM provision "designating Plaintiff as a known criminal organization is unwarranted by the facts and not in accordance with law"; and (2) the FAM provision is *ultra vires* because "Congress did not intend . . . 8 U.S.C. § 1182(a)(3)(A), to result in a blanket denial of visas to all members of Plaintiff's group solely based on their membership in that group." ECF No. 1 ¶¶ 33-34.

The issues that HAMC raises are simply not within the proper purview of the judiciary. Regardless of whether HAMC has standing or its claims are ripe, the doctrine of consular nonreviewability precludes this lawsuit.

> **2.    The doctrine of consular nonreviewability would apply to any HAMC challenge to visa denials, notwithstanding the D.C. Circuit's decision in *Abourezk v. Reagan*.**

The D.C. Circuit's decision in *Abourezk v. Reagan*, 785 F.2d 1043 (D.C. Cir. 1986), *aff'd by an equally divided Court*, 484 U.S. 1 (1987), does not undermine the conclusion that the

---

[10] The domestic and international law enforcement concerns related to the Hells Angels are well-documented in publicly available materials. *See, e.g.* National Gang Threat Assessment at 30, National Gang Intelligence Center (2009); Europol Review 2011 at 62-63. The Threat of Outlaw Motorcycle Gangs (OMCGs) in South East Europe, OC-Scan Policy Brief, Europol, available at https://www.europol.europa.eu/sites/default/files/publications/2010-oc-scan-threat-notice-policy-brief.pdf (last visited Oct. 24, 2012).

doctrine of consular nonreviewability would apply to any visa denial claim that HAMC might

pursue.  In *Abourezk*, the court held that "[j]udicial review was proper . . . when United States

sponsors of a foreign individual claim that the State Department's denial of a visa to an alien

violated their constitutional rights."  *See Saavedra Bruno*, 197 F.3d at 1163 (citing *Abourezk*,

785 F.2d at 1050).  Such judicial review "extend[ed] to the statutory as well as the constitutional

propriety of the State Department" application of a statutory inadmissibility provision.

*Abourezk*, 785 F.2d at 1051.

 The first problem with *Abourezk* is that Congress's amendment of 8 U.S.C. § 1329 in the

Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA") fatally

undermines its jurisdictional holding.  Essential to the holding in *Abourezk* was the panel's

determination that 8 U.S.C. § 1329 (1982) gave the court "specific jurisdiction over claims

arising under the [INA]."  *Abourezk*, 785 F.2d at 1050.  That point was essential because the

APA and the general federal question jurisdiction statute, 28 U.S.C. § 1331, *do not* create

jurisdiction over consular decision in the absence of other congressional authorization.  *Saavedra

Bruno*, 197 F.3d at 1162-63.  However, Congress amended § 1329 in the IIRIRA, "making clear

that district court jurisdiction founded on the immigration statute is [now] confined to actions

*brought by the government*."  *Saavedra Bruno*, 197 F.3d at 1162 (emphasis added).  This

material change to § 1329 "reinforce[ed] the judgment . . . that the immigration laws preclude

judicial review of consular visa decisions and that the doctrine of consular nonreviewability

remains intact, until Congress provides otherwise."  *Id.* at 1162-63.  Thus, *Abourezk* is no longer

good law to the extent that it suggests that this Court could review HAMC's claims.

 The second problem with *Abourezk* is that it conflicts with *Mandel*, which limited judicial

review to whether the Government provided a "facially legitimate and bona fide" reason for the

visa denial, *even when* United States citizens assert constitutional claims. *See Mandel*, 408 U.S. at 770. The narrow inquiry contemplated by the Supreme Court does not comport with the type of expanded review sanctioned by *Abourezk*. The divided *Abourezk* panel did not have the power to overrule *Mandel* or any other previous decision of the D.C. Circuit recognizing the limitations on judicial review in *Mandel*. *See Castaneda-Gonzalez v. INS*, 564 F.2d 417, 428 n.25 (1977) (citing *Mandel* for the proposition that, "when constitutional rights of American citizens are implicated, government may be required to show 'facially legitimate and bona fide reason' for refusal of visa"). "As a decision of a panel, *Abourezk* cannot be treated as an overruling of *Castaneda-Gonzalez* . . . and it cannot be read as expressing disagreement with other decisions recognizing the doctrine of consular nonreviewability." *Saavedra Bruno*, 197 F.3d at 1163. Thus, *Mandel* controls.

A finding of jurisdiction under *Abourezk* for a visa challenge by HAMC would undermine the doctrine of consular nonreviewability. Any alien denied a visa could, with the assistance of a United States citizen friend or family member, ask a court to determine whether the denial was "within the statutory and constitutional authority of the State Department." *Abourezk*, 785 F.2d at 1061. The United States citizen would merely have to file a lawsuit challenging the visa denial, cite the First Amendment, and allege that he or she wanted to socialize with the alien in the United States. The doctrine of consular nonreviewability would, under those circumstances, lose much of its meaning. For that reason, judicial review of any consular visa decision should *never* extend beyond a narrow inquiry into whether a facially legitimate and bona fide reason existed for the decision, even when a United States citizen alleges a plausible constitutional violation. *See Mandel*, 408 U.S. at 770.

**D.      Even if this Court had jurisdiction to consider HAMC's statutory or constitutional claims, those claims fail as a matter of law.**

Even if this Court accepts the limited form of jurisdiction contemplated by *Abourezk*, HAMC still fails to state a viable claim for relief.  Under *Abourezk*, this Court's review is still limited to a determination whether the Department of State's future application of 8 U.S.C. § 1182(a)(3)(A)(ii) to active members of the Hells Angels would violate either that statute or the Constitution.[11]  *See Abourezk*, 785 F.2d at 1051.  HAMC does not state any viable statutory or constitutional claim.

HAMC's primary legal claim is that 9 FAM 40.31 N5.3 is *ultra vires* because Congress did not intend for 8 U.S.C. § 1182(a)(3)(A) to "result in a blanket denial of visas to all members of Plaintiff's group."  ECF No. 1 ¶ 34.  But HAMC cannot show that the FAM provision exceeds Defendants' lawful authority.  First, the premise of HAMC's claim is false because the FAM provision does not dictate the denial of any visa application; it merely creates a presumption of inadmissibility under § 1182(a)(3)(A)(ii) that an alien can potentially overcome.  *See* 9 FAM 40.31 N5.3(a), (d).  Second, the *rebuttable presumption* that active members of designated criminal groups are inadmissible under § 1182(a)(3)(A)(ii) is fully consistent with the language of that statute and the INA.  Notably, § 1182(a)(3)(A)(ii) creates a low threshold for an inadmissibility determination – a consular officer must deny a visa merely if he has "reasonable ground to believe" that an alien may engage even incidentally in unlawful activity after entry

---

[11] The Government maintains that, even if the Court follows *Abourezk*, there is no judicial review over the application of the FAM to individual members of Hells Angels.  The factual determination in 9 FAM 40.31 N5.3, that the Hells Angels is an organized criminal group, is non-final and non-binding agency action that is not subject to judicial review.  *See supra* Argument § B.2.  A consular officer's factual determination that a particular alien is a member of Hells Angels is fully immune from judicial review under the doctrine of consular nonreviewability.  *See Loza-Bedoya*, 410 F.2d at 346-47 (consular decision based on erroneous information not subject to judicial review).

into the United States.  And aliens always bear the burden of establishing eligibility for a visa.

*See* 8 U.S.C. § 1361 (burden of proof is on the alien to show eligibility for a visa).  If an active

member of an organized crime group seeks a visa, it is inherently reasonable to presume that

there is "reasonable ground to believe [that the alien] seeks to enter the United States to engage

solely, principally, or incidentally in . . . unlawful activity."  8 U.S.C. § 1182(a)(3)(A)(ii).  The

FAM provision thus is fully consistent with the statute.

Furthermore, Congress has acquiesced to the Department of State's interpretation of 8

U.S.C. § 1182(a)(3)(A)(ii) (and its predecessor) because the State Department has published

guidance including the presumption relating to members of organized criminal groups for around

47 years without Congressional interference.  *See Haig v. Agee*, 453 U.S. 280, 298-303 (1981)

(Congressional acquiescence in longstanding executive interpretation indicates interpretation's

validity).  Also, contrary to HAMC's suggestion, Congress's provision of an avenue for judicial

review of a "foreign terrorist organization" designation under 8 U.S.C. § 1189(c) does not

suggest that Congress disapproves of the Department of State's interpretation of 8 U.S.C.

§ 1182(a)(3)(A)(ii).  Unlike designation of organized crime groups in the FAM, the designation

of a "foreign terrorist organization" under § 1189 has severe criminal and civil implications for

both United States and foreign members and supporters of such groups.  *See* 18 U.S.C. § 2339B

(providing material support to a foreign terrorist organization is a felony punishable by up to 15

years imprisonment).  Rather, designation as an organized crime group under the FAM is more

closely analogous to undesignated "Tier III" terrorist organizations.  *See* 8 U.S.C.

§ 1182(a)(3)(B)(vi)(III) (defining "terrorist organization" to include any group that engages, or

that has a subgroup that engages, in terrorist activities).  A group is considered a Tier III terrorist

organization based on executive officials' reasonable belief that the group engaged in certain

activity, and that determination is not subject to any procedural protections or special means of administrative or judicial review. Thus, contrary to HAMC's argument, the statutory scheme of the INA does not imply that Congress would have intended international organized crime groups to have any right to judicial review of their treatment as such. *See Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 95 (1990) (a waiver of sovereign immunity like the one found in 8 U.S.C. § 1189(c) must be explicit; it cannot be implied); *United States v. Gonzales*, 520 U.S. 1, 5 (1997) ("'Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'").

HAMC's constitutional claims likewise fail. HAMC does not purport to represent alien Hells Angels members who have any significant connection with the United States showing that they have accepted the societal obligations of this country, and thus those aliens are not entitled to the protections of the First and Fifth Amendments. *See DKT Mem'l Fund Ltd v. Agency for Int'l Dev.*, 887 F.2d 275, 284 (D.C. Cir. 1989) ("[A]liens beyond the territorial jurisdiction of the United States are generally unable to claim the protections of the First Amendment."); *United States v. Verdugo-Urquidez*, 494 U.S. 259, 269 (1990) (at least where an alien has no prior significant contact with the United States and has not accepted the societal obligations of the United States, the alien is not entitled to "Fifth Amendment rights outside the sovereign territory of the United States"). To the extent that HAMC purports to represent itself or United States citizen Hells Angels members, its constitutional claims likewise fail. A United States citizen who wishes to socialize with an alien in the United States has no due process right regarding the alien's admission. *See Mostofi*, 841 F. Supp. 2d at 212. Likewise, the Government does not violate a United States citizen's or HAMC's First Amendment right to associate with the alien

28

merely by presuming the alien's ineligibility for a visa based on his membership in an organized criminal group.  *See Ukrainian-Am. Bar Ass'n*, 893 F.2d at 1381.  Also, a United States citizen has no First Amendment right to socialize or to go on motorcycle rides in the United States with aliens whose only connection is their membership in a foreign charter of an umbrella group that also has charters in the United States.  There is no "generalized right of 'social association.'" and the activities that HAMC mentions do not apparently involve "intimate human relationships" or the "expressive association" that the Constitution protects.  *See Stanglin*, 490 U.S. at 24-25 (holding that the First Amendment does not protect activity such as "coming together to engage in recreational dancing").

Finally, HAMC does not assert a viable claim that § 1182(a)(3)(A)(ii) is either vague or overbroad.  These claims fail, first, because "[t]he constitutional requirement of fair warning has no applicability to standards . . . for admission of aliens to the United States," given that "Congress has plenary power to make rules for the admission of aliens."  *Boutilier v. INS*, 387 U.S. 118, 123 (1967).  Second, these claims fail because HAMC fails to explain why the statute is vague or overbroad; its conclusory allegations are insufficient.  *See* ECF No. 1 ¶¶ 37-38; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("A pleading that offers 'labels and conclusions' or 'a formulaic of the elements of a cause of action will not do.'").  Finally, Congress was not required to be any more specific or to tailor 8 U.S.C. § 1128(a)(3)(A)(ii) any more narrowly than it already has.  *See Palestine Info. Office v. Schultz*, 853 F.2d 932, 944 (D.C. Cir. 1988) (explaining that courts must afford Congress greater leeway in drafting civil immigration statutes because "the conduct of foreign policy will sometimes require more general enactments than other government functions").

Therefore, this Court should dismiss HAMC's statutory and constitutional claims under Rule 12(b)(6) because these claims fail as a matter of law.  *See Neitzke*, 490 U.S. at 326-27.

**E.**     **To the extent that HAMC's claims implicate Hells Angels members who seek entry without a visa, 8 U.S.C. §§ 1187(g), and (h)(3)(C)(iv) bar the claims.**

HAMC's claims all relate to the situation where a Hells Angels member applies for a visa at a United States consulate abroad, and the consular officer denies the visa application.  *See* ECF No. 1.  That is not the only way in which an active member of the Hells Angels might seek to travel to the United States.  An alien Hells Angels member who is the national of a country designated under the Visa Waiver Program ("VWP") may seek to travel to the United States and enter without a visa under VWP.  *See* 8 U.S.C. § 1187(g).  Even anticipating that factual scenario, no jurisdiction would exist.  The Government addresses this hypothetical scenario solely to show that amendment of the Complaint is futile, and dismissal should be *with* prejudice.

 The VWP allows tourists from certain countries to apply for admission to the United States without a visa for up to 90 days.  8 U.S.C. § 1187(a).  In 2007, Congress mandated DHS's creation of the Electronic System for Travel Authorization ("ESTA"), whereby DHS must authorize aliens seeking to travel to the United States under the VWP, which gives DHS an opportunity to determine whether such aliens pose an unacceptable law enforcement risk.  *See* Implementing Recommendations of the 9/11 Commission Act of 2007, Pub. L. No. 110-53, Title VII, § 711(b), 121 Stat. 266, 338-45 (adding 8 U.S.C. § 1187(h)(3)). Aliens who will seek admission under the VWP must provide biographical information in advance of travel to allow DHS to determine whether the alien is authorized for travel under the VWP.  8 U.S.C. § 1187(a)(11).  Certain aliens, conceivably including alien members of Hells Angels, may be denied travel authorization under ESTA due to their membership in an organization designated under 9 FAM 40.31 N.5.3(a).  Other aliens, possibly including members of Hells Angels, may

actually travel to a United States port of entry but be denied admission under the VWP after inspection by a United States Customs and Border Protection officer. In either situation, judicial review is statutorily barred, although the alien could still apply for a visa.

Congress has determined that, "[n]otwithstanding any other provision of law, no court shall have jurisdiction to review an eligibility determination under [ESTA]." 8 U.S.C. § 1187(h)(3)(C)(iv). Likewise, Congress has precluded judicial review over any decision by DHS to deny an alien entry under the visa waiver program based on inadmissibility; the alien's sole remedy is to apply for a visa at "an appropriate consular office." The statute reads:

> In the case of an *alien denied a waiver* under the program by reason of a *ground of inadmissibility described in section 1182(a)* of this title that is discovered at the time of the alien's application for the waiver or through the use of an automated electronic database required under subsection (a)(9) of this section, the alien may apply for a visa at an appropriate consular office outside the United States. There shall be *no other means of administrative or judicial review* of such a denial, and *no court or person otherwise shall have jurisdiction* to consider any claim attacking the validity of such a denial.

8 U.S.C. § 1187(g) (emphasis added). Thus, the statute is clear that this court would not possess jurisdiction to review claims by foreign Hells Angels members challenging VWP eligibility determinations in these factual scenarios.

Notably, denial of entry under the VWP would not, in itself, preclude the alien from receiving a visa. The alien's recourse in that situation is to "apply for a visa at an appropriate consular office outside the United States." 8 U.S.C. § 1187(g); *id.* § 1187(h)(3)(C)(iii) (denial of travel authorization through ESTA "is not a determination of eligibility for a visa"). This procedure would allow the individual to attempt to overcome the presumptive inadmissibility through the mechanisms described *supra*, § I.B.

31

The VWP scenario and the applicable statutory bar are, again, presented only to emphasize that HAMC's claims are futile under this additional set of circumstances and that this Court should dismiss the Complaint with prejudice and without leave to amend.

## IV.  CONCLUSION

HAMC cannot establish jurisdiction for multiple reasons.  HAMC lacks standing to sue on its own behalf or on behalf of individual Hells Angels members.  HAMC's claims are unripe and not otherwise subject to review because they depend on future agency action (denial of a visa) and focus on the State Department's non-binding internal interpretation of law.  Even if HAMC were challenging an actual decision to deny a specific visa application, the doctrine of consular nonreviewability would preclude judicial review of that decision.  Finally, aside from those jurisdictional defects, HAMC fails to identify any Constitutional right that plausibly is being violated and fails to state a viable claim for which relief may be granted.  Therefore, this Court should dismiss the Complaint with prejudice under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

Dated:  November 26, 2012                    Respectfully submitted,

STUART F. DELERY                             s/ Craig A. Defoe
Principal Deputy Assistant Attorney General  CRAIG A. DEFOE
                                             Trial Attorney
JEFFREY S. ROBINS                            United States Department of Justice
Assistant Director                           Office of Immigration Litigation
                                             District Court Section
                                             P.O. Box 868, Ben Franklin Station
                                             Washington, D.C. 20044
                                             Telephone: (202) 532-4114
                                             Facsimile: (202) 305-7000
                                             E-mail: Craig.Defoe@usdoj.gov

                                             Attorneys for Defendants

## CERTIFICATE OF SERVICE

I hereby certify that on this 26th day of November, 2012, I electronically filed the

foregoing DEFENDANTS' MOTION TO DISMISS with the Clerk of the Court using CM/ECF,

which will automatically serve the following counsel with a copy of said document:

    Margaret W. Wong
    MARGARET W. WONG AND ASSOCIATES CO, LPA
    3150 Chester Avenue
    Cleveland, OH 44114
    E-mail: wong@imwong.com

    Matthew M. Robinson
    ROBINSON & BRANDT, P.S.C.
    629 Main Street, Suite B
    Covington, KY 41011
    E-mail: mrobinson@robinsonbrandt.com

    Attorneys for Plaintiff

                /s/ Craig A. Defoe
                Craig A. Defoe
                Trial Attorney
                United States Department of Justice
                Office of Immigration Litigation
                District Court Section

                Attorney for Defendants